# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 04-1379

NORTHWESTERN MEMORIAL HOSPITAL,

*Plaintiff-Appellee,*

v.

JOHN ASHCROFT, Attorney General of the United States,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 55—**Charles P. Kocoras**, *Chief Judge.*

_____

ARGUED MARCH 23, 2004—DECIDED MARCH 26, 2004

_____

Before POSNER, MANION, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* The government appeals from an order by the district court quashing a subpoena commanding Northwestern Memorial Hospital in Chicago to produce the medical records of certain patients on whom Dr. Cassing Hammond had performed late-term abortions at the hospital using the controversial method known variously as "D & X" (dilation and extraction) and "intact D & E" (dilation and evacuation). We accelerated briefing and

argument, and now accelerate our decision, in view of the pressures of time discussed later in the opinion.

The subpoenaed records, apparently some 45 in number, are sought for use in the forthcoming trial in the Southern District of New York of a suit challenging the constitutionality of the Partial-Birth Abortion Ban Act of 2003, Pub. L. No. 108-105, 117 Stat. 1201, 18 U.S.C. § 1531. See *National Abortion Federation v. Ashcroft*, No. 03 Civ. 8695 (RCC), 2004 WL 540470 (S.D.N.Y. Mar. 17, 2004) (order denying summary judgment for plaintiffs). Dr. Hammond is one of the plaintiffs in that suit and will also be testifying as an expert witness. The district court held that the production of the records is barred by regulations issued under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. 104-191, 110 Stat. 1936, and let us begin there.

Section 264 of HIPAA, 42 U.S.C. § 1320d-2 Note, directs the Secretary of Health and Human Services to promulgate regulations to protect the privacy of medical records, but provides in subsection (c)(2) that such a regulation "shall not supercede a contrary provision of State law, if the provision of State law imposes requirements, standards, or implementation specifications that are more stringent than the requirements, standards, or implementation specifications imposed under the regulation." See also 45 C.F.R. § 160.203(b). A standard is "more stringent" if it "provides greater privacy protection for the individual who is the subject of the individually identifiable health information" than the standard in the regulation. § 160.202(6).

The particular focus of the appeal is an HHS regulation entitled "Standard: Disclosures for Judicial and Administrative Proceedings," § 164.512(e), which authorizes a "covered entity" (such as Northwestern Memorial Hospital) to disclose private health information in judicial or adminis-

trative proceedings "in response to an order of a court." § 164.512(e)(1)(i). The regulation also allows the disclosure of such information in those proceedings "in response to a subpoena, discovery request, or other lawful process," § 164.512(e)(1)(ii), if the party seeking the information either notifies the patient (or at least makes a good faith effort to do so) or makes a "reasonable effort" to secure a qualified protective order, that is, an order that prohibits the use or disclosure of the information outside the litigation and requires the return or destruction of the information at the end of the litigation. 45 C.F.R. § 164.512(e)(1)(v).

The district judge presiding over the case in New York issued an order authorizing, although not directing, the hospital to provide the records to the government after redaction to remove information identifying the patients. The parties agree that his order is an "order" within the meaning of the "in response" provision. It hardly matters; the government didn't need such an order because it had obtained a protective order, thus qualifying under the alternative procedure for disclosure of medical records. But under Illinois law, even redacted medical records are not to be disclosed in judicial proceedings, with immaterial exceptions. 735 ILCS 5/8-802; *Department of Professional Regulation v. Manos*, 782 N.E.2d 237, 246-47 (Ill. 2002); *Parkson v. Central DuPage Hospital*, 435 N.E.2d 140, 143-44 (Ill. App. 1982). The district court in our case ruled that the Illinois law, because it sets a "more stringent" standard for disclosure than the HIPAA regulation, trumps that regulation by virtue of HIPAA's supersession provision. So he quashed the subpoena, precipitating this appeal.

Although the issue is not free from doubt, we agree with the government that the HIPAA regulations do not impose state evidentiary privileges on suits to enforce federal law. Illinois is free to enforce its more stringent medical-records

privilege (there is no comparable federal privilege) in suits in state court to enforce state law and, by virtue of an express provision in Fed. R. Evid. 501, in suits in federal court (mainly diversity suits) as well in which state law supplies the rule of decision. But the Illinois privilege does not govern in federal-question suits, such as the suit in the Southern District of New York. The enforcement of federal law might be hamstrung if state-law privileges more stringent than any federal privilege regarding medical records were applicable to all federal cases. We say "might" not "would" because some federal statutes authorize subpoenas in terms that would override the HIPAA regulations. See, e.g., 18 U.S.C. § 3486; *In re Subpoena Duces Tecum*, 228 F.3d 341 (4th Cir. 2000). But almost certainly there are gaps; and we think it improbable that HHS intended to open such a can of worms when it set forth a procedure for disclosure of medical records in litigation—intended, that is, to be regulating, actually or potentially (depending on other statutory provisions regulating subpoenas), the litigation of federal employment discrimination cases, social security disability cases, ERISA cases, Medicare and Medicaid fraud cases, Food and Drug Administration cases, and the numerous other classes of federal case in which medical records whether of the parties or of nonparties would not be privileged under federal evidence law.

All that 45 C.F.R. § 164.512(e) should be understood to do, therefore, is to create a procedure for obtaining authority to use medical records in litigation. Whether the records are actually admissible in evidence will depend among other things on whether they are privileged. And the evidentiary privileges that are applicable to federal-question suits are given not by state law but by federal law, Fed. R. Evid. 501, which does not recognize a physician-patient (or hospital-patient) privilege. Rule 501 in terms makes federal common law the source of any privileges in federal-question suits

unless an Act of Congress provides otherwise. We do not think HIPAA is rightly understood as an Act of Congress that creates a privilege.

The purely procedural character of the HIPAA standard for disclosure of medical information in judicial or administrative proceedings is indicated by the procedure for disclosure in response to a subpoena or other process; the notice to the patient must contain "sufficient information about the litigation or proceeding in which the protected health information is requested to permit the individual to raise an objection to the court." § 164.512(e)(1)(iii)(B). The objection in court would often be based on a privilege—the source of which would be found elsewhere than in the regulations themselves.

This conclusion is buttressed by a HIPAA regulation which says that the "more stringent" clause applies only to "individually identifiable health information," § 160.203(b), as opposed to "health information that does not identify an individual and with respect to which there is no reasonable basis to believe that the information can be used to identify an individual." § 164.514(a). Provided that medical records are redacted in accordance with the redaction requirements (themselves quite stringent) of § 164.514(a), they would not contain "individually identifiable health information" and the "more stringent" clause would fall away.

As an alternative basis for quashing the subpoena, the district judge undertook to craft a new federal common law privilege for abortion records. He based this ruling on their sensitivity, which he compared to that of psychotherapists' treatment records, held privileged in *Jaffee v. Redmond*, 518 U.S. 1 (1996). The creation of new common law evidentiary privileges is authorized by Fed. R. Evid. 501, and *Jaffee* is not the only recent case in which the authority was exercised. *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332

F.3d 976, 979-81 (6th Cir. 2003); *In re Air Crash Near Cali, Colombia*, 959 F. Supp. 1529, 1533-35 (S.D. Fla. 1997), and *United States v. Lowe*, 948 F. Supp. 97, 99-100 (D. Mass. 1996), all created new privileges on the authority of *Jaffee*. But none relates to medical records and we are reluctant to embark on a case-by-case determination of the relative sensitivity of medical records of different ailments or procedures. Most medical records are sensitive, and many are as sensitive as late-term abortion records, such as the records of AIDS patients. Proceeding down the path taken by the district court would inevitably result in either arbitrary line drawing or the creation of an Illinois-type comprehensive privilege for medical records. Northwestern Memorial Hospital concedes that there is no federal common law physician-patient privilege. It is not for us—especially in so summary a proceeding as this litigation to quash the government's subpoena—to create one, whether all at once or by a process of slow but inevitable additions to the sole category recognized by *Jaffee*. Cf. *University of Pennsylvania v. EEOC*, 493 U.S. 182, 188-89 (1990); *United States v. Nixon*, 418 U.S. 683, 707-13 (1974); *In re Witness Before Special Grand Jury 2000-2*, 288 F.3d 289 (7th Cir. 2002); *In re Sealed Case*, 148 F.3d 1073, 1078-79 (D.C. Cir. 1998) (per curiam).

The district court did not reach a further ground urged by the hospital for quashing the government's subpoena, which is simply that the burden of compliance with it would exceed the benefit of production of the material sought by it. Fed. R. Civ. P. 45(c)(3)(A)(iv); *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 563 (7th Cir. 1984); *Roberts v. Shawnee Mission Ford, Inc.*, 352 F.3d 358, 361-62 (8th Cir. 2003); *Miscellaneous Docket Matter # 1 v. Miscellaneous Docket Matter # 2*, 197 F.3d 922, 926-27 (8th Cir. 1999); *In re Sealed Case*, 162 F.3d 670, 673-74 (D.C. Cir. 1998). However, in support of his ruling expanding the federal common law of privilege to embrace the medical records of abortion

patients, the judge made findings that are highly germane to—indeed arguably dispositive of— the Rule 45(c) issue. He pointed out that the "government seeks these records on the *possibility* that it may find something therein which would affect the testimony of Dr. Hammond adversely, that is, for its potential value in impeaching his credibility as a witness. What the government ignores in its argument is how little, if any, probative value lies within these patient records." He contrasted the dearth of probative value "with the potential loss of privacy that would ensue were these medical records used in a case in which the patient was not a party" and concluded that "the balance of harms resulting from disclosure severely outweighs the loss to the government through non-disclosure."

These findings were solidly based. The hospital had urged both the lack of probative value of the records and the loss of privacy by the patients. The government had responded in generalities, arguing that redaction would eliminate any privacy concern and that since Dr. Hammond had "made assertions of fact about his experience and his patients that plaintiffs are using to support their claim that, without a health exception, the Act is unconstitutional," the government should be permitted to test those assertions; but the government had not indicated what assertions these were or how the records might bear on them. Although on appeal the hospital repeated at length its reasons for believing that the records sought by the government would have little or no probative value, the government's response in both its opening brief and its reply brief remained vague to the point of being evasive.

At the oral argument we pressed the government's lawyer repeatedly and hard for indications of what he hoped to learn from the hospital records, and drew a blank. (Contrary to our usual practice, we did not limit the length of the oral

argument.) The lawyer did suggest that if Hammond testified that patients with leukemia are better off with the D & X procedure than with the conventional D & E procedure but the medical records indicate that not all abortion patients with leukemia undergo D & X abortions, this would both impeach Hammond and suggest that D & X is not the only medically safe abortion procedure available to pregnant women afflicted with leukemia. But such information would be unlikely to be found in *Hammond's* records, given his strongly expressed preference for using the D & X method in the case of patients in fragile health. The information would be much more likely to be found in the records of physicians who perform D & E rather than D & X abortions on such women. Those records, however, the government didn't seek.

We learned at argument for the first time that Dr. Hammond has been deposed in the New York litigation. The questions and answers in his deposition might illuminate the relevance of the medical records for impeachment of his testimony at the trial. But the government has made no effort to make the deposition a part of the record.

Ordinarily when a district judge has not addressed an issue committed to his discretion, such as the balance of benefit and burden in complying with a subpoena, e.g., *Peate v. McCann*, 294 F.3d 879, 884 (7th Cir. 2002); *Deitchman v. E.R. Squibb & Sons, Inc., supra*, 740 F.2d at 563; *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 729 (8th Cir. 2002), and the issue becomes critical to the disposition of the appeal, the appellate court must remand to give the judge a chance to exercise his discretion. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709 (1986). We do not follow that course, here, however, for two reasons. The first is that the judge, in the passages we quoted from his opinion, struck the balance—in other words, "weigh[ed the] competing hard-

ships." *Deitchman v. E.R. Squibb & Sons, Inc.*, *supra*, 740 F.2d at 563. True, he did so in the course of addressing a different issue from whether Rule 45(c) required that the subpoena be quashed; but, realistically, the result of a remand is foreordained.

The second reason is that with the trial in New York scheduled to begin on March 29 and to last only four weeks, the practical effect of a remand would be to moot the issue of compliance with the subpoena. The time factor is unfortunate, and is not the fault of the government (or of anyone else, so far as appears). If time permitted a remand, the judge would on remand examine the records, or at least a sample of them, in camera, as in the parallel subpoena case of *Planned Parenthood Federation of America, Inc. v. Ashcroft*, No. C03-4872 PJH, 2004 WL 432222 (N.D. Cal. Mar. 5, 2004), to determine whether they are likely to have any probative value. Time does not permit. The government has not suggested that the case be remanded if we reject the district court's grounds for quashing the subpoena. A remand would be tantamount to mooting its appeal; in the government's words, "a remand would entirely frustrate the Government's interest in preparing a timely defense in the New York trial, which will begin on March 29." We take this as a waiver of any objection to our weighing the hardships ourselves, and we proceed to the weighing. See *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 923 n. 2 (10th Cir. 1986); *McCord v. Bailey*, 636 F.2d 606, 613 (D.C. Cir. 1980); cf. *International Ins. Co. v. Caja Nacional De Ahorro y Seguro*, 293 F.3d 392, 401 (7th Cir. 2002); *Dillard v. City of Greensboro*, 213 F.3d 1347, 1355-57 (11th Cir. 2000).

Like the district judge, we think the balance weighs in favor of quashing the subpoena. The government does not deny that the hospital is an appropriate representative of the privacy interests of its patients. *Parkson v. Central DuPage Hospital*, *supra*, 435 N.E.2d at 142. But it argues that since it

is seeking only a limited number of records and they would be produced to it minus the information that would enable the identity of the patient to be determined, there would be no hardship to either the hospital or the patients from compliance. The argument is unrealistic and incomplete. What is true is that the *administrative* hardship of compliance would be modest. But it is not the only or the main hardship. The natural sensitivity that people feel about the disclosure of their medical records—the sensitivity that lies behind HIPAA—is amplified when the records are of a procedure that Congress has now declared to be a crime. Even if all the women whose records the government seeks know what "redacted" means, they are bound to be skeptical that redaction will conceal their identity from the world. This is hardly a typical case in which medical records get drawn into a lawsuit. Reflecting the fierce emotions that the long-running controversy over the morality and legality of abortion has made combustible, the Partial-Birth Abortion Ban Act and the litigation challenging its constitutionality—and even more so the rash of suits around the country in which the Department of Justice has been seeking the hospital records of abortion patients—have generated enormous publicity. These women must know that, and doubtless they are also aware that hostility to abortion has at times erupted into violence, including criminal obstruction of entry into abortion clinics, the fire-bombing of clinics, and the assassination of physicians who perform abortions.

Some of these women will be afraid that when their redacted records are made a part of the trial record in New York, persons of their acquaintance, or skillful "Googlers," sifting the information contained in the medical records concerning each patient's medical and sex history, will put two and two together, "out" the 45 women, and thereby

expose them to threats, humiliation, and obloquy. As the court pointed out in *Parkson v. Central DuPage Hospital*, *supra*, 435 N.E.2d at 144, "whether the patients' identities would remain confidential by the exclusion of their names and identifying numbers is questionable at best. The patients' admit and discharge summaries arguably contain histories of the patients' prior and present medical conditions, information that in the cumulative can make the possibility of recognition very high." In its opening brief, as throughout the district court proceeding, the government expressly reserved the right, at a later date, to seek the identity of the patients whose records are produced. Pressed at argument, the government's lawyer abandoned the reservation; but we do not know what would prevent reconsideration should the government, the subpoena having been enforced, discover that particular medical records that it had obtained were incomplete, opaque, or ambiguous.

Even if there were no possibility that a patient's identity might be learned from a redacted medical record, there would be an invasion of privacy. Imagine if nude pictures of a woman, uploaded to the Internet without her consent though without identifying her by name, were downloaded in a foreign country by people who will never meet her. She would still feel that her privacy had been invaded. The revelation of the intimate details contained in the record of a late-term abortion may inflict a similar wound.

If Northwestern Memorial Hospital cannot shield its abortion patients' records from disclosure in judicial proceedings, moreover, the hospital will lose the confidence of its patients, and persons with sensitive medical conditions may be inclined to turn elsewhere for medical treatment. It is not as if the government were seeking medical records from every hospital and clinic that performs late-term

abortions, in which event women wanting assurance against the disclosure of their records would have nowhere to turn. It is Dr. Hammond's presence in the New York suit as plaintiff and expert that has resulted in the government's subpoenaing the records of Northwestern Memorial Hospital.

The concerns that the hospital has articulated do not necessarily justify withholding probative evidence from the government; nor can the possibility that medical records of abortion patients would yield evidence germane to the constitutionality of the Partial-Birth Abortion Ban Act be gainsaid. A nearly identical state predecessor of the Act was invalidated by the Supreme Court in *Stenberg v. Carhart*, 530 U.S. 914 (2000), because it did not permit the D & X procedure in cases in which it is required to protect the health of the pregnant woman. *Id.* at 930-38. In response, the preamble to the Act contains a finding that the procedure is *never* required for health reasons. 117 Stat. 1201, § 2. The government concedes as it must that this finding, although entitled to respectful consideration, does not bind the courts. E.g., *United States v. Morrison*, 529 U.S. 598, 614 (2000); *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 665-66 (1994) (plurality). The issue of medical necessity remains for determination at the trial in New York, where Dr. Hammond will testify that he believes there are situations in which the D & X procedure is medically indicated. The essential difference between that procedure and the conventional D & E procedure is that in the latter procedure the fetus is destroyed while it is still entirely within the womb, while in the former procedure it is destroyed after the lower extremities, and sometimes the torso, have emerged from the womb and only the head remains inside. It is because part of the fetus is outside the womb when the fetus is destroyed that the supporters of the Act describe the D & X procedure as "partial birth" abortion. Dr. Hammond and

other D & X practitioners argue that because less of the fetus is in the womb there is less danger of cutting the woman's tissues with the sharp knives used to dismember the fetus's body in the conventional D & E procedure and causing hemorrhaging, and that if the woman is in fragile health avoiding that danger is medically indicated.

The merits of the dispute are for determination at trial. The only issue for us is whether, given that there is a potential psychological cost to the hospital's patients, and a potential cost in lost goodwill to the hospital itself, from the involuntary production of the medical records even as redacted, the cost is offset by the probative value of the records. The district judge presiding at the trial has said that the records are "relevant," and no doubt they are—in the attenuated sense in which nonprivileged materials may be sought in discovery. "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1); see *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 350-52 (1978); *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 995-96 (7th Cir. 2002). The trial judge has not opined on the *probative* value of the records, which appears to be meager.

The government has had repeated opportunities to articulate a use for the records that it seeks, and it has failed to do so. What it would like to prove at the trial in New York, to refute Dr. Hammond, is that D & E is always an adequate alternative, from the standpoint of a pregnant woman's health, to the D & X procedure. But the government has failed to explain how the record of a D & X abortion would show this. And it is not as if Hammond had relied on the medical records of his patients in preparing his expert testimony. (Had he done so, the records would have had to be disclosed to the government under Fed. R. Civ. P.

26(a)(2).) He doesn't have the records, is not basing his testimony on them, and so far as appears doesn't even remember them.

None of the records is going to state that Dr. Hammond said that he performed a D & X although he believed that a D & E would be just as good. We thought the government might be hoping to find in the records evidence that Hammond had lied when he said he had performed a D & X on a woman who had leukemia or a woman who had breast cancer, but at argument the government disclaimed any such suggestion. We're still at a loss to understand what it hopes to gain from such discovery. (We begged the government's lawyer to be concrete.) Of course, not having seen the records, the government labors under a disadvantage, although it has surely seen other medical records. And of course, pretrial discovery is a fishing expedition and one can't know what one has caught until one fishes. But Fed. R. Civ. P. 45(c) allows the fish to object, and when they do so the fisherman has to come up with more than the government has been able to do in this case despite the excellence of its lawyers.

The Partial-Birth Abortion Ban Act was passed, as we said, in response to the Supreme Court's decision in the *Stenberg* case. *Stenberg* was one of a number of "first generation" partial-birth cases. The others were *Hope Clinic v. Ryan*, 195 F.3d 857 (7th Cir. 1999) (en banc), vacated, 531 U.S. 1271 (2000); *Planned Parenthood of Wisconsin v. Doyle*, 162 F.3d 463 (7th Cir. 1998); *Planned Parenthood of Greater Iowa, Inc. v. Miller*, 195 F.3d 386 (8th Cir. 1999); *Little Rock Family Planning Services, P.A. v. Jegley*, 192 F.3d 794 (8th Cir. 1999); *Summit Medical Associates, P.C. v. Pryor*, 180 F.3d 1326 (11th Cir. 1999); *Richmond Medical Center for Women v. Gilmore*, 144 F.3d 326 (4th Cir. 1998); *Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187 (6th Cir. 1997);

*Armstrong v. State*, 989 P.2d 364 (Mont. 1999); *WomanCare of Southfield, P.C. v. Granholm*, 143 F. Supp. 2d 827 (E.D. Mich. 2000); *Rhode Island Medical Soc. v. Whitehouse*, 66 F. Supp. 2d 288 (D.R.I. 1999), affirmed, 239 F.3d 104 (1st Cir. 2001) (per curiam); *Richmond Medical Center for Women v. Gilmore*, 55 F. Supp. 2d 441 (E.D. Va. 1999), affirmed, 224 F.3d 337 (4th Cir. 2000) (per curiam); *Causeway Medical Suite v. Foster*, 43 F. Supp. 2d 604 (E.D. La. 1999), affirmed, 221 F.3d 811 (5th Cir. 2000); *A Choice for Women v. Butterworth*, 54 F. Supp. 2d 1148 (S.D. Fla. 1998); *Planned Parenthood of Central New Jersey v. Verniero*, 22 F. Supp. 2d 331 (D.N.J. 1998); *Planned Parenthood of Central New Jersey v. Verniero*, 41 F. Supp. 2d 478 (D.N.J. 1998), affirmed under the name *Planned Parenthood of Central New Jersey v. Farmer*, 220 F.3d 127 (3d Cir. 2000); *Eubanks v. Stengel*, 28 F. Supp. 2d 1024 (W.D. Ky. 1998), affirmed, 224 F.3d 576 (6th Cir. 2000) (per curiam); *Midtown Hospital v. Miller*, 36 F. Supp. 2d 1360 (N.D. Ga. 1997); *Planned Parenthood of Southern Arizona, Inc. v. Woods*, 982 F. Supp. 1369 (D. Ariz. 1997); *Evans v. Kelley*, 977 F. Supp. 1283 (E.D. Mich. 1997). In one of the cases decided by this court, *Hope Clinic v. Ryan*, *supra*, Dr. Hammond was both a plaintiff and an expert witness. *Hope Clinic v. Ryan*, 995 F. Supp. 847, 849-50 (N.D. Ill. 1998). Yet in *none* of these many cases, so far as either we or the government is aware, was it so much as suggested that patient records might contain information that would help answer the question, crucial then as now, whether the D & X procedure is ever medically necessary.

Although Hammond is a plaintiff in the New York case, presumably because he actually performs D & X abortions and wants to be allowed to continue doing so, he will be testifying as an expert medical witness. Of all experts who testify in court, physicians are probably the most common. Yet the government has cited to us no case before this one in which medical experts' patient records were used to im-

peach the expert (*Langley v. Coughlin*, No. 84 Civ. 5431 (LBS), 1989 WL 436675 (S.D.N.Y. June 19, 1989), rejected the attempt, in a helpful discussion), though in malpractice cases it is not uncommon to use redacted medical records bearing on the defendant's alleged negligence for impeachment, as in *Terre Haute Regional Hospital, Inc. v. Trueblood*, 600 N.E.2d 1358 (Ind. 1992), and *Todd v. South Jersey Hospital System*, 152 F.R.D. 676, 684-85 (D.N.J. 1993).

Were the government sincerely interested in whether D & X abortions are ever medically indicated, one would have expected it to seek from Northwestern Memorial Hospital statistics summarizing the hospital's experience with late-term abortions. Suppose the patients who undergo D & X abortions are identical in all material respects (age, health, number of weeks pregnant, and so on) to those who undergo procedures not forbidden by the Partial-Birth Abortion Ban Act. That would be potent evidence that the D & X procedure does not have a compelling health rationale. No such evidence has been sought, in contrast to the *Planned Parenthood* case, *supra*, at Transcript 26 (Mar. 5, 2004). A variant of the suggested approach would be to obtain a random sample of late-term abortion records from various sources and then determine, through good statistical analysis, whether the patient characteristics that lead Dr. Hammond to perform a D & X lead other physicians to perform a conventional D & E instead, and whether there are differences in the health consequences for these two groups of women. If there are no differences, the government might have a good defense of the Act. Gathering records from Hammond's patients alone will not be useful; but if the government has *other* records (say, from VA hospitals) already in its files, then records of Hammond's procedures might enable a useful comparison. The government hasn't suggested doing anything like that either. Its motives in seeking individuals' medical records remain thoroughly obscure.

The question whether the D & X procedure is ever medically indicated will be resolved as a matter of legislative fact not requiring the taking of trial-type testimony at all (see *Hope Clinic v. Ryan*, *supra*, 195 F.3d at 885 (dissenting opinion)), or will pivot on the clash of expert witnesses at the New York trial, or perhaps, as suggested by *Stenberg*, will be answered by some combination of these two approaches to determining facts. The medical records of expert witnesses are irrelevant to the first inquiry; and, so far as we can determine after having listened to the government's arguments at length, those records will not figure significantly in the resolution of experts' disagreements either.

The fact that quashing the subpoena comports with Illinois' medical-records privilege is a final factor in favor of the district order's action. As we held in *Memorial Hospital for McHenry County v. Shadur*, 664 F.2d 1058, 1061 (7th Cir. 1981), comity "impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy." See also *United States v. One Parcel of Property Located at 31-33 York Street*, 930 F.2d 139, 141 (2d Cir. 1991) (per curiam). Patients, physicians, and hospitals in Illinois rely on Illinois' strong policy of privacy of medical records. They cannot rely completely, for they are not entitled to count on the state privilege's being applied in federal court. But in a case such as this in which, so far as we can determine, applying the privilege would not interfere significantly with federal proceedings, comity has required us, not to apply the Illinois privilege, but to consider with special care the arguments for quashing the subpoena on the basis of relative hardship under Fed. R. Civ. P. 45(c).

AFFIRMED.

MANION, concurring in part, dissenting in part. I agree with the court that HIPAA does not adopt state privilege law in a federal question suit brought in federal court, but rather Rule 501 of the Federal Rules of Evidence governs the evidentiary privileges applicable in such suits. Opinion at 3-4. I also agree that it is not for us to create a federal common law physician-patient privilege where none exists, and that the redacted medical records are not privileged. Opinion at 4-6. However, for several reasons, I disagree with the court's conclusion that enforcing the subpoena creates an undue burden under Fed. R. Civ. P. 45(c)(3) (A)(iv). In passing HIPAA, Congress recognized a privacy interest only in "individually identifiable medical records" and not redacted medical records, and HIPAA preempts state law in this regard. The "de-identification" (redaction) of all identifying information from the medical records and the extensive protective order in place also eliminate any privacy interest in the records. Additionally, not only are the records in this case relevant, as the court acknowledges, but they are highly probative of the underlying issue. Finally, contrary to the court's conclusion that quashing the subpoena occurs "at no substantial cost to federal substantive and procedural policy," both suffer greatly. This court should enforce the subpoena. I therefore concur in part and dissent in part.

As the court recognizes, in section 264 of HIPAA, Congress authorized the Secretary of Health and Human Services to promulgate regulations to protect the privacy of medical records. Opinion at 2 (*citing* 42 U.S.C. § 1320d-2 Note). Therefore, HIPAA and the related regulations determine the privacy interests at stake. While tediously detailed, these regulations appear to have thoroughly considered and resolved the privacy concerns expressed by the hospital and the court.

Section 164.502, which sets forth the general rules for the use and disclosure of "protected health information," provides that "[a] covered entity may not use or disclose protected health information, except as permitted or required by this subpart or by subpart C of part 160 of this subchapter." 45 C.F.R. § 164.502(a). Before looking to the various exceptions, the initial question is whether the information sought in this case is "protected health information." The regulations define "protected health information" as "individually identifiable health information." 45 C.F.R. § 160.103. Both Congress and HHS define "individually identifiable health information" as information that "is created or received by a health care provider, health plan, employer, or health care clearinghouse; and relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, *and—(i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe the information can be used to identify the individual."* 42 U.S.C. § 1320d(6); 45 C.F.R. § 160.103 (emphasis added).

In this case, the government seeks only redacted medical records and agrees that all identifying information may be removed before Northwestern makes the records available for its review. Because the records will be redacted, they will not identify the individual. Nor is there a reasonable basis to believe that the information can be used to identify the individual. Section 164.514(b) confirms the latter conclusion. Section 164.514(b)(2)(i) sets forth specific identifiers which, if removed, "de-identify" the health records:

   (A) Names;

   (B) All geographic subdivisions smaller than a State, including street address, city, county, precinct, zip code,

and their equivalent geocodes, except for the initial three digits of a zip code if, according to the current publicly available data from the Bureau of the Census:

(1) The geographic unit formed by combining all zip codes with the same three initial digits contains more than 20,000 people; and

(2) The initial three digits of a zip code for all such geographic units containing 20,000 or fewer people is changed to 000.

(C) All elements of dates (except year) for dates directly related to an individual, including birth date, admission date, discharge date, date of death; and all ages over 89 and all elements of dates (including year) indicative of such age, except that such ages and elements may be aggregated into a single category of age 90 or older;

(D) Telephone numbers;

(E) Fax numbers;

(F) Electronic mail addresses;

(G) Social security numbers;

(H) Medical record numbers;

(I) Health plan beneficiary numbers;

(J) Account numbers;

(K) Certificate/license numbers;

(L) Vehicle identifiers and serial numbers, including license plate numbers;

(M) Device identifiers and serial numbers;

(N) Web Universal Resource Locators (URLs);

(O) Internet Protocol (IP) address numbers;

(P) Biometric identifiers, including finger and voice prints;

(Q) Full face photographic images and any comparable images; and

(R) Any other unique identifying number, characteristic, or code, except as permitted by paragraph (c) of this section;

45 C.F.R. § 164.514(b)(2)(i).

Once these identifiers are redacted, the medical records are no longer "individually identifiable health information." 45 C.F.R. § 164.514(a).[1] Under HIPAA and the imple--menting regulations, there is no protected privacy interest in non-identifiable health information. Again, the regulations confirm this conclusion. 45 C.F.R. § 164.502(d)(2) provides:

*Uses and disclosures of de-identified information.* Health information that meets the standard and implementation specifications for de-identification under § 164.514(a) and (b) is considered not to be individually identifiable health information, i.e., de-identified. The requirements of this subpart *do not* apply to information

---

[1] The government does not object to the removal of these identifiers and in fact has consented to redaction beyond that required by Section 164.514(b)(2)(i), for instance by agreeing that Northwestern may delete the state of residence. The fact that the regulations allow the disclosure of the patient's state disproves Northwestern's assertion that, because the hospital is located in Chicago, the patients could be identified since they would be assumed to be from Illinois. Such an assumption is unreasonable given that HIPAA allows for that very disclosure, while still treating the records as de-identified. But in any event, the government does not request that information.

that has been de-identified in accordance with the applicable requirements of § 164.514 . . . .

45 C.F.R. § 164.502(d)(2) (emphasis added).

Because the government seeks only redacted records that are not individually identifiable, under HIPAA there is no privacy interest in those records. However, even if the records were "individually identifiable," they would still be subject to the general privacy rules governing use and disclosure of protected health information set forth in § 164.502. As noted above, the privacy protection afforded in that section provides several exceptions. 45 C.F.R. § 164.502(a) ("A covered entity may not use or disclose protected health information, *except as permitted* or required by this subpart or by subpart C of part 160 of this subchapter.") (emphasis added). Of relevance here is 45 C.F.R. § 164.512(e)(1)(i), which authorizes the disclosure of protected health information pursuant to a court order. In this case, the government obtained a court order authorizing the disclosure of the medical records. Under the regulations, such an order negates any need to redact identifying information.[2] 45 C.F.R. § 164.512(e)(1)(i). Yet, as the government stressed at oral argument, it has no need for, nor desire to know, the individual identities of the patients. Therefore, it is only seeking the relevant redacted medical records. Such redacted records are afforded no privacy protection under HIPAA, logically so because the redacted

---

**[2]** **As the court also recognizes, the government did not need a court order in this case because it obtained a protective order securing the confidentiality of the redacted records. Opinion at 3. Thus, the government complied with the privacy protections established by HIPAA in three independent ways: by obtaining a court order; by obtaining a protective order; and by seeking only redacted records.**

records have no identifiably private information to expose. And although Illinois law has adopted an expansive view of privilege that includes redacted medical records, as the court recognizes, Illinois law does not govern this question.

That should end the inquiry. But instead the court resurrects the privacy question through the "undue burden" language of Fed. R. Civ. P. 45(c)(3)(A)(iv). Rule 45(c)(3)(A)(iv) provides that a court may quash or modify a subpoena if it "subjects a person to undue burden." Fed. R. Civ. P. 45(c)(3)(A)(iv). In the court's view, compliance with the subpoena would impose an undue burden (i.e. "potential psychological cost") on the women whose redacted records were subpoenaed. Such an undue burden exists, according to the court, because the potential loss of privacy outweighs the probative value of the medical records. *See* opinion at 7 (stating that the Illinois district court's finding that the "potential loss of privacy that would ensue were these medical records used in a case in which the patient was not a party . . . outweighs the loss to the government through non-disclosure" is "solidly based"). This conclusion is wrong on several levels.

Initially, to reiterate, HIPAA and the implementing regulations recognize that there is no loss of privacy where the medical records are redacted (or in HIPAA jargon, "de-identified"). Nor is it reasonable to believe that the unidentified 45 women have acquaintances who "will put two and two together, 'out' the 45 women, and thereby expose them to threats, humiliation, and obloquy." Opinion at 11. In fact, there is no reason to believe that the women themselves have any idea that their records are among the few sought by the government in this case. But even if they

knew,[3] no one else ever would, because all of the information that could reasonably be used to identify them will be redacted, *see* 45 C.F.R. § 164.514(b)(2)(i), and none of the information—not even the redacted non-identifying information—will ever be made public, much less paraded in court or placed on the Internet within the reach of "skillful 'Googlers'." Opinion at 11. That is guaranteed by the additional security of the protective order entered in this case in the Southern District of New York. *See, e.g., Reproductive Serv., Inc. v. Walker*, 439 U.S. 1307, 1308 (1978) (Brennan, J., in chambers) (dissolving stay of subpoena seeking abortion records of non-party patients on condition that patient names were redacted and parties agreed to a protective order to ensure privacy of all patients).

The court's erroneous conclusion that a privacy interest exists in the redacted documents leads to the unnecessary attempt to assess the probative value of the evidence. Notably, the district court (Judge Kocoras) did not reach the undue burden of compliance issue of Fed. R. Civ. P. 45(c)(3)(A)(iv). In the interest of time, with the trial date at hand, the court bypasses a remand and accepts the district court's findings on the privilege issue and applies them to the undue burden question. It then in effect agrees with the district court that there is little if any probative value in the requested documents. Based on the complaint, Dr. Hammond's declaration, the congressional findings when it passed the law, and the arguments made by the government and the hospital (both very limited since priv-

---

[3] **Notwithstanding the court's discussion of the notice procedures of HIPAA, see opinion at 5, HIPAA does not require notice where a court order authorizes disclosure, 45 C.F.R. § 164.512(e)(1), where there is a protective order in place, 45 C.F.R. § 164.512(e)(1)(ii)(B), or where the records are redacted, 45 C.F.R. § 164.502(d)(2).**

ilege, not probative value, was the issue argued below), there is significant probative value. But that is not for us to decide, as the probative value of the evidence has already been determined. District Court Judge Casey, who is presiding over the underlying case, believes the information is relevant, so much so that he has indicated that if it is not produced, he would consider lifting the stay and dismissing the case (or at least dismissing Dr. Hammond from the case). This should also make clear that Judge Casey believes the evidence is not just relevant "in the attenuated sense," opinion at 13, but highly probative to the difficult question he will face starting on March 29. If any deference is owed, it is to the presiding judge—the judge who handled this case pre-trial and who knows the arguments presented by both sides, and the judge who will need all (non-privileged) relevant evidence available to allow him to make the necessary factual findings to determine this difficult and contentious constitutional case.

However, while recognizing that "[t]he merits of the dispute are for determination at trial," opinion at 13, the court nonetheless interjects its own theory of the case and its own judgment of the probative value of the evidence. For instance, the court states: "What [the government] would like to prove at the trial in New York, to refute Dr. Hammond is that D & E is always an adequate alternative, from the standpoint of a pregnant woman's health, to the D & X procedure. But the government has failed to explain how the record of a D & X abortion would show this." Opinion at 13-14. But the government's document request was not so structured: The government did not ask for the records of the D & X abortions identified by Dr. Hammond, but rather requested the redacted medical records of patients who had abortions—both the D & E and D & X variety—for the reasons asserted by Dr. Hammond as justifying a partial-birth abortion. For instance, Dr.

Hammond stated that he sometimes performed abortions for women to protect their health after they learned that "their fetuses have anomalies that are often quite severe." Declaration ¶ 4. The government requested the patient records for 2003 of any women who had an abortion during their 19th or 20th week of pregnancy, (whether partial-birth or D & E) for that reason. Interrogatories 1 at 3; Document Request at 7. As the government explained at oral argument, those records are highly relevant to the question of medical necessity because, if they show that Dr. Hammond did not regularly perform partial-birth abortions under those circumstances, that would demonstrate that Dr. Hammond does not believe a partial-birth abortion is necessary to protect the women's health. Of course, there could be some variations in the medical conditions of the individual cases that explain why Dr. Hammond used a different method, but Dr. Hammond remembers few, if any, of the circumstances surrounding the abortions. Opinion at 14. Thus, the only way the government (and the trial judge) can assess Dr. Hammond's contention that partial-birth abortions are medically necessary to protect the women's health is to review the medical records of the patients with the conditions that Dr. Hammond referenced.

The court rejects this theory, stating: "But such information would be unlikely to be found in *Hammond's* records, given his strongly expressed preference for using the D & X method in the case of patients in fragile health. The information would be much more likely to be found in the records of physicians who perform D & E rather than D & X abortions on such women. Those records, however, the government didn't seek." Opinion at 8. But that is exactly the point: The government does not know what is to be found in Dr. Hammond's medical records. It only knows what could be found there—evidence that, notwithstanding Dr. Hammond's declaration that he strongly prefers using

the D & X method of abortion on patients in fragile health, in practice, he does not use that procedure. Such evidence would be highly probative, as the court itself implies by recognizing it "would be unlikely to be found in *Hammond's* records given his strongly expressed preference for using the D & X method."

In fact, the relevance here cannot be overstated: Congress made explicit findings that a partial-birth abortion is never medically necessary to protect a women's health. Yet, Dr. Hammond claims Congress was wrong. The court concisely lays out Dr. Hammond's argument: In a D & X (partial-birth) abortion, the fetus "is destroyed after the lower extremities, and sometimes the torso, have emerged from the womb and only the head remains inside," and this, according to Dr. Hammond is safer then the D & E procedure, where "the fetus is destroyed while it is still entirely within the womb . . . ." Opinion at 13. Dr. Hammond seeks to testify accordingly, and it is therefore imperative that the government be able to determine the veracity of his testimony. There is no better way than by determining if Dr. Hammond's actual practice supports his testimony. And this is not a question only of impeachment, but rather concerns the heart of this case.

Moreover, as the government explained during oral argument, the medical records are highly relevant to its case because its experts must be able to review Dr. Hammond's files to determine whether, in their expert opinion, a D & X procedure was the most appropriate procedure, as Dr. Hammond claims. The court recognizes that the need for a health exception to the ban in the Partial-Birth Abortion Ban Act "will pivot on the clash of expert witnesses at the New York trial, . . . ." Opinion at 17. Yet, the court refuses to recognize the importance of the redacted records to the

government's case, even after the government explained the need for its experts to review the files to form independent expert opinions.

The medical records are also highly relevant to a second congressional finding, namely, that a "partial-birth abortion poses serious risks to the health of a woman undergoing the procedure." 117 Stat. 1201. Congress detailed numerous risks it found posed by partial-birth abortions. Although the government did not point this out during oral argument, Northwestern's attorney alerted the court to the fact that the medical records will show whether there were any complications from the abortion, and this evidence is highly probative to the underlying constitutional challenge.[4]

The court also questions whether the government sincerely wants to determine "whether D & X abortions are ever medically indicated," because the government did not seek summary statistics of all circumstances in which such abortions are performed. Opinion at 16. But as the government pointed out at oral argument, it was trying to limit the burden on Northwestern by confining its document request to those specific situations where Dr. Hammond claimed a partial-birth abortion was necessary to preserve the mother's health. *See* Fed. R. Civ. P. 45(c)(1) ("A party or attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue

---

[4] **Northwestern also acknowledged another point of relevancy during questioning: When asked whether the records could possibly demonstrate that the woman's life—and not just her health—was at risk, Northwestern's attorney responded, "yes, but that would help the other side." This case is not about sides, but about the document request, and providing the district court with the evidence it needs to resolve the constitutional question before it.**

burden or expense on a person subject to that subpoena."). And it succeeded, maybe even better than the government had hoped: During oral argument, the government learned for the first time that there are only 45 records that satisfy its document request. Given that Dr. Hammond stated in his declaration that he performs, teaches or supervises about 300 abortions a year, and that the government sought the records for a two- to three-year time frame, it probably surprised the government to learn that there were only 45 relevant records, with the rest apparently unrelated to the mother's or fetus's health.

In any event, the limited scope of the document request, and the government's agreement to redact the records—something not required by HIPAA—if anything, refute any questioning of the government's motives or the court's implication that the government is on a fishing expedition. Opinion at 14. Although contradictory, the court also chastises the government for not asking for enough records, implying that since the government did not ask for all relevant documents, the documents it did request were somehow less than relevant. Granted, there were many more relevant records that the government did not seek, but the government should not be impugned for prudently limiting its document request to those few medical records Dr. Hammond directly referenced.[5]

---

[5] **The court also charges the government with being evasive on the question of the probative value of the medical documents. Opinion at 7. It is true that the government's main focus was not on the probative value of the medical records, but that is neither surprising nor nefarious, given the arguments below and the district court's ruling. The district court in this case ruled that Illinois privilege law governed and not HIPAA. The question of the relevance and probative value of the documents was not**

(continued...)

That brings us back to the question of undue burden, which, along with HIPAA, should have been the focus of the narrow question before the district court and this court in this case. Under Rule 45, a court may quash a subpoena where it creates an undue burden. There is no such burden

---

(...continued)

central to the question of whether Illinois privilege law applied. This court appropriately reversed the district court on the privilege issue without delving into the question of relevance. Thus, it is not surprising that the government's opening brief did not focus on the relevancy of the documents. Moreover, although Northwestern argued below that the documents were not relevant, it did so in the context of arguing for a federal common law doctor-patient privilege. On appeal, the government did not need to argue relevancy to address that legal issue, and in fact, this court again appropriately rejected the idea of a federal common law privilege without addressing the question of relevance. Relevance only became relevant once the court discounted the import of HIPAA *de*-identification and looked to a balancing test under Rule 45(c)(3)(A)(iv). Again, that the government's opening brief did not focus on this question is not surprising given that Northwestern's Rule 45(c)(3)(A)(iv) undue burden argument below was limited to three short paragraphs, and the only tangential reference to relevance in its opening brief came from this sentence: "The Attorney General's subpoena is an unacceptable intrusion into the privacy of the Hospital's patients, promising no significant contribution to the ascertainment of truth in *NAF v. Ashcroft.*" Memorandum in Support of Northwestern Memorial Hospital's Motion to Quash Subpoena at 20. After Northwestern changed direction on appeal, to argue that the production of the records constituted an undue burden because the records were not relevant, the government responded at length in its reply brief. *See* Appellant's Reply Brief at 8-11. At oral argument, the government also elaborated on the relevance of the documents, not in a vague or evasive way, but by specifically demonstrating that the medical records are *both* relevant and highly probative of the issues in the underlying case. *See supra* at 26-29.

in this case because HIPAA establishes that there is no privacy interest in redacted records and those records are highly relevant to the constitutional challenge to the Partial Birth Abortion Ban Act. The only burden identified by the court seems to be a "potential psychological cost." Opinion at 13. Even assuming that is the kind of "burden" Rule 45 contemplates, reliance on that as a burden in effect creates a privilege where none exists.[6]

Finally, contrary to the court's conclusion, quashing the subpoena in this case does come at a "substantial cost to federal substantive and procedural policy." The court's ruling may well be the death knell for Dr. Hammond's claim, as the district court made clear that it believed the records relevant and that it would consider dismissing the case if the records were not produced. Given that the government cannot adequately cross-examine Dr. Hammond, the district court would be well within its rights to bar Dr. Hammond's testimony, which will not only harm his case, but also the other plaintiffs'. The court's decision also comes at a substantial cost to the federal policy adopted by HIPAA. Lastly, and most significantly, it comes at a cost to

---

[6] **Northwestern does not claim that it is an undue burden to comply with the subpoena because it is too costly, difficult or time-consuming to produce the redacted records, only that it may negatively impact its reputation with past and future patients. The court agrees, calling it a "potential cost in lost goodwill," opinion at 13, because Northwestern "will lose the confidence of its patients, and persons with sensitive medical conditions may be inclined to turn elsewhere for medical treatment." Opinion at 12. However, this is not an authentic "cost," because the same federal regulations apply equally to all hospitals. These regulations put all hospitals on the same footing, thus negating any basis for a patient rejecting a hospital's care because a federal court orders the production of redacted records pursuant to a federal regulatory standard.**

the truth of Congress' findings that a partial-birth abortion is never necessary to protect a woman's health and poses significant health risks, and to the constitutionality of such a law. For these and the foregoing reasons, I would enforce the subpoena to produce the designated records.


A true Copy:

      Teste:


                  _____
                  *Clerk of the United States Court of*
                  *Appeals for the Seventh Circuit*